UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gary Reed and Tom Vevea,
as Trustees of the Minnesota
Laborers Health and Welfare
Fund et al.,

    Plaintiffs,

v.            MEMORANDUM OPINION
               AND ORDER
               Civil No. 09-1976

EnviroTech Remediation Services, Inc.
And Lindstrom Cleaning & Construction
Inc. d/b/a Lindstrom Restoration and
Lindstrom Environmental, Inc.

    Defendants.

_____

   Pamela Hodges Nissen and Natalie W. Kohner, Anderson, Helgen, Davis
& Nissen, P.A. and William K. Ecklund and Ruth S. Marcott, Felhaber, Larson,
Fenlon & Vogt, P.A., Counsel for Plaintiffs.

   Timothy A. Sullivan, Sarah E. Crippen and Elizabeth C. Borer, Best &
Flanagan LLP, Counsel for Defendant Lindstrom Cleaning & Construction, Inc.

_____

## I. Introduction

Plaintiff Trust Funds (the "Funds") brought this action seeking unpaid

employee benefit contributions from EnviroTech Remediation Services, Inc.

("EnviroTech").[1]  The Funds later added Lindstrom Cleaning & Construction, Inc. d/b/a Lindstrom Restoration and Lindstrom Environmental, Inc. ("Lindstrom") as a defendant, claiming that Lindstrom is the alter ego or successor in interest to EnviroTech.

Lindstrom asserts that it is entitled to summary judgment because it did not sign a collective bargaining agreement with the laborer's union, and because successor or alter ego liability does not attach to Lindstrom concerning any delinquent employee benefit contributions in this case.

## II.   Factual Background

### A.   EnviroTech

EnviroTech was incorporated in 2001 to provide remediation services to property owners.  (4th Sobaski Aff., Ex. C.)  These services include the removal of asbestos prior to renovation or demolition.  Property owners in need of such services will work with industrial hygienist consultants and the industry, and its procedures are regulated by the Minnesota Pollution Control Agency ("MPCA").  Both union and non-union workers perform this work.  EnviroTech joined the

---

[1]The Funds were granted partial summary judgment against EnviroTech in the amount of $184,000 as to Count I of the Amended Complaint.

Minnesota Environmental Contractors Association ("MECA") in 2002, and thereby agreed to be bound by the provisions of the relevant collective bargaining agreement ("CBA") between MECA and the Asbestos Workers Local 205 and Minnesota Laborers District Council.  (Borer Aff., Ex. A.)

Ownership of EnviroTech shares was divided as follows: Brent Krause, 42.51%; William Sievers, 35.48%; Dan Krause, 14.17%; Brent Anderson, 2.93%; David Sobaski, 4.22%; Jeffrey Dahl, .23%; Don Bent, .23%; and Ted Pladson, .23%. (1st Sobaski Aff. ¶ 4.)  David Sobaski was the President of EnviroTech until August 2009.  (4th Sobaski Aff. ¶ 6.)

EnviroTech began experiencing financial troubles in 2008.  (4th Sobaski Aff. ¶ 8.)  In November 2008, Sievers talked with Sobaski about the financial troubles the company was experiencing, and told him that he was going to recommend shutting the company down and ceasing operations.  (Id. ¶ 8.)  After discussion, they decided to keep the company operating long enough to complete work on contracts that had already been executed.  (Id.)  Sobaski offered to forego receiving a salary, and for two months in late 2008 and early 2009, he did not receive a salary.  (Id. ¶ 9.)  When he was put back on the payroll, his annual salary was cut from $120,000 to $70,000.  (Id.)

At the end of 2008, it became clear to Sobaski that he would not have a job for much longer at EnviroTech, so he began to look for another position.  (Id. ¶ 10.)  In the meantime, EnviroTech worked with Sealed Bid Marketing to sell the business.  (Id. ¶ 11.)  EnviroTech's banker, Mitch Joyce from Central Bank, thought the Sealed Bid estimate for the company, $2 million, was optimistic as it was his opinion the company had no worth by the end of 2008.  (Borer Aff., Ex. B (Joyce Dep. at 40).)

By July 2009, the only prospective buyer was a Michigan company owned by an individual named Art Dore, who bid $827,000 for Envirotech.  (Id., Ex. G.) Certain EnviroTech employees, however, had concerns about selling the company to Dore, such as whether they would be offered jobs with the new company and subject to non-competition agreements.  (Id. ¶ 13.)  At some point, Jerry Clark from Sealed Bid was told by Sievers that the sale to Dore would not happen as Sievers had doubts about Dore being "to [sic] tough" and that Dore may take advantage of Sievers.  (Borer Aff., Ex. C.)  A Preliminary Liquidation Analysis done in August 2009 valued EnviroTech's inventory at $167,450 and a fixed asset liquidation at $32,616.  (Id., Ex. D.)

4

**B.     Lindstrom**

Lindstrom Cleaning & Construction has been in business since 1945, but prior to August 2009, the company did not perform environmental remediation services.  (Id., Ex. E (Lindstrom Dep. at 7); 4th Sobaski Aff., Ex. B.)  At some time in and around early 2009, Lindstrom was considering whether to open an environmental remediation division that would offer the same services as EnviroTech, and was interested in talking with Sobaski about a possible position with Lindstrom, given Sobaski's experience in the environmental remediation business.  (4th Sobaski Aff.,¶ 14; Borer Aff., Ex. E (Lindstrom Dep. at 7).)  In February 2009, Sobaski did talk with Les MacLeod, a sales person at Lindstrom, but at that time, Sobaski was committed to EnviroTech.  By July 2009, however, Sobaski again contacted MacLeod about the possibility of employment given the likelihood that EnviroTech would not continue in business.  (4th Sobaski Aff. ¶ 15.)  Sobaski later met with MacLeod and Kevin Grady of Lindstrom to discuss this opportunity further.  (Id.)

On August 10, 2009, Sobaski began work as President of Lindstrom Environmental.  (Id. ¶ 17; Doc. No. 140, Ex. 4.)  Sobaski, in turn, told EnviroTech employees Jeff Dahl, Jim Moeller and Jennifer Hilsgen about Lindstrom starting

an environmental services division, and that he would need help to build that

division for Lindstrom.  (Id. ¶ 19.)  These employees applied for positions with

Lindstrom, and were eventually hired. (Id.)  Dahl and Moeller serve as a

Estimator/Project Managers for Lindstrom Environment, Don Bentz[2] serves as

Controller, and Hilsgen as Officer Manager.  (Kohner Aff. [Doc. No. 140] Ex. 4.)

By August 15, 2009, Sobaski, Hilsgen, Dahl and Moeller appear on Lindstrom

Environmental payroll records.  (Id. Ex. 5.)  Many field workers that previously

worked for EnviroTech have been hired for particular jobs by Lindstrom.  (4th

Sobaski Aff., Exs. K and L; Carlson Aff., Ex. 2.)

## C.    Facts Relevant to Whether Lindstrom Continued EnviroTech's Business

When Lindstrom began its environmental services division, it rented office

and warehouse space from EnviroTech for a period of three months.  (4th Sobaski

Aff. ¶ 25, Ex. H.)  Thereafter, Lindstrom prepared its own office space in a

separate location.  (Id.)  At about the time Lindstrom was starting up its

environmental services division, Sobaski learned that Central Bank was planning

---

[2]Lindstrom stresses that Don Bentz provided accounting and financial services for EnviroTech as an independent contractor, and serves as a consultant for Lindstrom Environmental. (Id. ¶ 21; Borer Aff., Ex. E (Lindstrom Dep. at 16).)  Bentz is nonetheless identified as Lindstrom Environmental's Controller on its website.  (Kohner Aff., [Doc. 140], Ex. 4.)

on liquidating EnviroTech's assets.  Sobaski, on behalf of Lindstrom, negotiated

with Sievers, on behalf of EnviroTech, about the price of equipment.  (Id. ¶ 23.)

Eventually, Central Bank and Sievers agreed to sell the equipment to Lindstrom

for $175,000.  (Id.)  The asset purchase was completed on August 25, 2009.  (Borer

Aff., Ex. G.)  Lindstrom did not assume any of EnviroTech's liabilities.  (Id.)  Nor

did Lindstrom purchase EnviroTech's accounts receivables.  (Id., Ex. B (Joyce

Dep. at 45).)

Prior to the asset sale to Lindstrom, Ted Pladson, the former Operations

Manager of EnviroTech, submitted a bid on behalf of EnviroTech for a project in

Minneapolis concerning a building owned by Aeon Corporation.  (4th Sobaski

Aff. ¶ 31; Borer Aff., Ex. F (Minnesota Department of Health Notification of Lead

Hazard dated August 7, 2009).)  The bid was in the amount of $56,880.  (Nissen

Aff., Ex. E (Pladson Dep. Ex. 12).)   Soon thereafter, EnviroTech learned that it

was the successful bidder on the project.  Pladson sent an email to Rosemary

Dolata, the Aeon project manager, informing her of Lindstrom Restoration.  (Id.,

Ex. G)  At his deposition, Pladson testified that he wrote the email to inform

Dolata "we were going to be Lindstrom now."  (Id. Ex. A (Pladson Dep. at 65).)

Pladson sent Dolata another email on August 11, 2009, to let her know "Our new

name and address" and thereafter listed Lindstrom's address.  (Id. at 66-67, Ex.

15.)

Sometime later, Sobaski sent Dolata information clarifying that Lindstrom

did not merge with EnviroTech, that Lindstrom had purchased EnviroTech's

assets, but not EnviroTech's name and that EnviroTech remained an active

company.  (Borer Aff., Ex. H.)  It was determined that EnviroTech would

maintain the project, but subcontract the work through Lindstrom

Environmental.  (Id. Ex. J.)

There is also evidence that Lindstrom Environmental may have completed

another job started by EnviroTech.  The Daily Site Logs for the project at Fairview

Riverside Medical Center to Lindstrom appear to reveal a complete continuity of

work between EnviroTech and Lindstrom.  (Skoog Aff., Ex. K.)

The Funds assert that there is also evidence in the record which suggests

some overlap of work performed by EnviroTech employees that went to work for

Lindstrom.   For example, prior to his start date at Lindstrom, Sobaski may have

sold several projects for Lindstrom before he started working for Lindstrom.

(Nissen Aff., Ex. Q (Lindstrom Dep. at 52-53).)  There is also evidence which

suggests that other former EnviroTech employees continued to perform work for

EnviroTech even after they began to work for Lindstrom.  For example, in

September 2009, Hilsgen, after she began working for Lindstrom, emailed Sievers

the EnviroTech Job Current Aging Report which is dated 09/21/09.  (Skoog Aff.,

Ex. J (Bates No. SIEVERS No. 00091-00092).)  She also emailed EnviroTech

customer Bobosdzenski and Sons, Inc., providing that company a current

certified payroll from EnviroTech relating to a project EnviroTech completed for

that firm.  (Id. (Bates No. SIEVERS No. 00067-00068).)  In an email dated October

16, 2009, Hilsgen wrote to Sievers asking "is it okay to mail the utility bills we

went over last week?"  (Id. (Bates No. SIEVERS No. 00071).)  These and other

emails found in the record (Skoog Aff., Ex. J) would indicate that both Sobaski

and Hilsgen continued to have access to the electronic and physical files of

EnviroTech and that they continued to be involved in working on files for

EnviroTech for months after EnviroTech allegedly ceased doing business.

Finally, Lindstrom Environmental uses the same bank as EnviroTech and

the same insurance company.  (Skoog Aff., Ex. A).  The Funds assert that these

facts further suggest a continuity of business between EnviroTech and

Lindstrom.

### D.     Lindstrom Environmental Earnings through December 31, 2010

Lindstrom Environmental's total sales through December 31, 2010 was

$5,670,243.  Of that amount, Lindstrom asserts that $1,293,714 was from

customers who had done business with EnviroTech, $1,033,847 of which was

from contracts that Lindstrom obtained through the competitive bidding process.

Thus, only $259,867 of Lindstrom's total sales were from jobs that originated

through EnviroTech; $66,209 was for the Aeon project subcontracted from

EnviroTech.  (4th Sobaski Aff. ¶¶ 27-30.)

### E.     National Labor Relations Board ("NLRB") Findings

In December 2009, the Fund issued a letter to former EnviroTech

employees, some of whom went to work for Lindstrom, informing of plan

changes effective January 10, 2010.  With regard to banked hours that could be

used to preserve health care coverage, the Fund stated that "hours credited to an

Active Laborer's Hour Bank will be forfeited" should the workers perform work

for an employer not covered by a collective bargaining agreement.   (Borer Aff.,

Ex. M.)

One former EnviroTech employee filed an unfair labor charge with the

NLRB naming EnviroTech as respondent and claiming that EnviroTech closed its

union operations and re-opened as a non-union company.  (Id., Ex. N.)  The

charge alleged EnviroTech created an alter ego (Lindstrom) in order to avoid its

union obligations. (Id.)  The NLRB dismissed the charge in February 2010,

concluding that there was insufficient evidence of a violation of the NLRA by

EnviroTech.  (Id., Ex. P.)

On February 23, 2010, Rod Skoog, the Fund Administrator, sent a letter to

Dean Bennett, a former EnviroTech employee and union member who was hired

by Lindstrom.  Skoog informed Bennett that because he was performing work for

Lindstrom, "who does not have and [sic] obligation to remit contributions to the

Fund", his banked hours were forfeited.  (Id., Ex. Q.)

## III.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56 (c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  This burden can be met "by 'showing' -

that is, pointing out to the district court - that there is an absence of evidence to

support the nonmoving party's case." Id. at 325.  The party opposing summary

judgment may not rest upon mere allegations or denials, but must set forth

specific facts showing that there is a genuine issue for trial.  Krenik v. County of

Le Sueur, 47 F.3d 953, 957 (8th Cir.1995).

## IV.    Analysis

### A.    No Written Agreement

Lindstrom first argues that federal law requires that with respect to money

or other thing of value to be paid to a trust fund established for the sole benefit of

employees, "the detailed basis upon which such payments are to be made " must

be "specified in a written agreement with the employer . . . " 29 U.S.C. § 186

(c)(5)(B)(2010).   Lindstrom has never entered into a written agreement with its

employees or a labor organization representing its employees.

Where there is no collective bargaining agreement between an employer

and union specifying the basis upon which trust payments would be made, there

is no valid trust and any payments by the employer are prohibited.  Moglia v.

Geoghegan, 403 F.2d 110, 117 (2d Cir. 1968) cert. denied 394 U.S. 919 (1969);

Robbins v. Main Line Hauling Col., Inc., 590 F. Supp. 1050, 1053-54 (E.D. Mo.

1984).   Non union employers could contribute to union fringe funds as long as

there is a separate agreement between the fund and any participating non union employer.  <u>Seafood Workers Health Fund Union Trustees v. Seafood Workers Health Fund Mgmt. Trustees</u>, 571 F. Supp. 483, 487 (D. Mass. 1983).

However, a non-signatory employer may be liable for a predecessor's contractual obligations, where the former is the alter ego of the latter.  <u>See,</u> e.g., <u>Brady v. Borchart Indus., Inc.</u>, Civil No. 05-1386, 2006 WL 3043138 (D. Minn. Oct. 25, 2006) (based on alter ego argument, court denied company summary judgment where two companies were wholly-owned by same individual and engaged in same type of salvage products); <u>Brady v. Swenke</u>, Civil No. 03-6381, 2004 WL 2697282 (D. Minn. Nov. 24, 2004).  Liability for delinquent employee benefit contributions may also attach to a successor corporation, under certain circumstances.  <u>See</u> <u>Einhorn v. M.L. Ruberton Const. Co.</u>, 632 F.3d 89 (3d Cir. 2011).  Thus, lack of a written agreement between the Funds and Lindstrom, in and of itself, is not determinative of whether Lindstrom is liable for any delinquent contributions to the Funds.

## B.     Alter Ego

The Funds argue that Lindstrom is liable for any unpaid fringe benefit contributions as Lindstrom is the alter ego of EnviroTech.  The alter ego doctrine

provides that "the legal fiction of the separate corporate identity may be rejected in the case of a corporation that (1) is controlled by another to the extent that it has independence in form only and (2) is used as a subterfuge to defeat public convenience." Kansas City Laborers Pension Fund v. Superior Gen. Contractors, Inc., 104 F.3d 1050, 1055 (8th Cir. 1997).  In Superior Gen., the Eighth Circuit held that the alter ego doctrine as developed under the NLRA involves a more lenient standard for disregarding corporate form than that employed by corporate law, and that in ERISA cases, the corporate law of alter ego doctrine is appropriately applied.  Id., 104 F.3d at 1055.  See also Minn. Laborers' Health and Welfare v. Scanlan, 360 F.3d 925, 927-28 (8th Cir. 2004).

The Court finds that the record is clear that Lindstrom is not the alter ego of EnviroTech.  There is no dispute that Lindstrom was a pre-existing corporation, and that Lindstrom Environmental was incorporated in 2009 to perform lead and asbestos remediation services.  There is no shared ownership of EnviroTech and Lindstrom stock, and there is no evidence that Lindstrom failed to follow corporate formalities.   Sobaski is the only officer of EnviroTech that is now an officer at Lindstrom Environmental.  While Sobaski did own a minority share of EnviroTech stock, there is no evidence that he owns any Lindstrom

stock.  The two companies have separate accounting books, bank accounts, and

insurance policies.  In sum, there is no evidence that EnviroTech controls any

aspect of Lindstrom Environmental.

The Court further finds that the Funds have offered no evidence that

Lindstrom Environmental acted with an unlawful intent or motive.  "[T]he focus

of the alter ego doctrine . . .  is on the existence of a disguised continuance of a

former business entity or an attempt to avoid the obligations of a collective

bargaining agreement, such as through a sham transfer of assets." Iowa Express

Distrib., Inc. v. Nat'l Labor Rel. Bd., 739 F.2d 1305, 1311 (8th Cir. 1984).  The

Funds have offered no evidence that Lindstrom Environmental was created for

the purpose of avoiding the union or that the asset sale was a sham transaction.

Rather, the evidence suggests that Lindstrom saw a business opportunity with

the demise of EnviroTech and formed a new corporation to take advantage of the

opportunity.  Lindstrom purchased EnviroTech's assets with its own financing

and has its own operating capital and insurance.  Accordingly, the Court finds

that Lindstrom Environmental is not the alter ego of EnviroTech.

## C.    Successor Liability

The Funds argue that Lindstrom may nonetheless be liable for unpaid

15

employee fringe benefit contributions under the theory of successor liability.

Accordingly, this case presents the issue of whether a purchaser of assets may be

held liable under ERISA for delinquent employee contributions under a theory of

successor liability.  This issue has not yet been addressed by the Eighth Circuit,

but several federal courts in other jurisdictions have found that a purchaser of

assets may be liable for a seller's delinquent ERISA fund contributions if the

purchaser had notice of the liability prior to the sale and there exists sufficient

evidence of continuity of operations between the buyer and the seller.  Einhorn,

632 F.3d at 99; Stotter Div. of Graduate Plastics Co., Inc. v. Dist. 65, 991 F.2d 997,

1002 (2d Cir. 1993);  Upholsterers' Union Pension Fund v. Artistic Furniture, 920

F.2d 1323, 1327 (7th Cir. 1990). See also Bd of Trustees of Unite Here Local 25 v.

MR Watergate LLC, 677 F. Supp.2d 229, 231 (D.D.C. 2010) (applying nine-part

test to determine whether purchaser of assets is a successor, subject to successor

liability analysis to determine withdrawal liability).

Lindstrom argues that these cases are not controlling because the Eighth

Circuit has held that liability for unpaid fringe benefit contributions under ERISA

arises only under the alter ego doctrine, citing the decision in Superior Gen., 104

F.3d at 1055.  As noted by the court in Einhorn, however, the Eighth Circuit's

decision in <u>Superior Gen. Contractors</u> is not "persuasive or relevant authority . . .

[as the] case did not involve an asset sale and [the] issue was whether defendant

was an alter ego."  <u>Einhorn</u>, 632 F.3d at 99, n. 10.  Because this case involves an

asset sale only, and the issue is successor liability, <u>Superior Gen.</u> is not controlling

on this issue.

Further, the bases for the decisions set forth in <u>Einhorn</u> and <u>Artistic</u>

<u>Furniture</u> are otherwise consistent with Eighth Circuit precedent.  For example,

in <u>Einhorn</u>, the court held that the federal common law successorship doctrine,

beginning with <u>Golden State Bottling Co. v. NLRB</u>, 414 U.S. 168 (1973), applied to

actions seeking recovery of delinquent pension fund contributions under ERISA.

<u>Einhorn</u>, 632 F.3d at 99.  In <u>Golden State</u>, the Supreme Court held that a

purchaser of a business could be held liable under the National Labor Relations

Act for remedying the seller's unlawful discharge of an employee, where the

successor employer had notice of the unfair practice and continued without

interruption or substantial change the predecessor's business operations.  414

U.S. at 184-85.  In so finding, the Court recognized that it must strike a balance

between the conflicting legitimate interests of the bona fide successor, the public

and the affected employees.  <u>Id.</u> at 181.  Ultimately, the Court held that "[s]ince

the successor must have notice before liability can be imposed, 'his potential

liability for remedying the unfair labor practices is a matter which can be

reflected in the price he pays for the business, or he may secure an indemnity

clause in the sales contract which will indemnify him for liability arising from the

seller's unfair labor practices.'" Id. at 185 (quoting Perma Vinyl Corp., 164

N.L.R.B. 968, 969 (1967)).

While Golden State arose in the labor law context, the court in Einhorn

recognized that numerous courts had extended its reasoning when necessary to

protect important employment-related policies.  Id. 632 F.3d at 95 (citing

Brozozowski v. Corr. Physician Servs., Inc., 360 F.3d 173, 177 (3d Cir. 2004)

(extending Golden State to Title VII claims)).  The court thereafter held that "the

federal policies underlying ERISA and the Multiemployer Pension Plan

Amendments Act of 1980 ("MPPAA"), Pub.L. 96–364, 94 Stat. 1208, 'are no less

important, and no less compel the imposition of successor liability than do the

policies animating the NLRA, Title VII,' or the other statutes to which the

doctrine has been extended."  Id. (quoting Artistic Furniture, 920 F.2d at 1327).

While the Eighth Circuit has not yet extended the "expanded" successor

liability set forth in Golden State to an action arising under ERISA, it has done so

18

in actions arising under CERCLA, <u>United States v. Mexico Feed and Seed Co.,</u>

<u>Inc.</u>, 980 F.2d 478, 488 (8th Cir. 1992) (adopting the "substantial continuation" test

because under the traditional successor liability test, responsible parties could

easily escape liability for the creation or maintenance of hazardous waste by a

predecessor corporation), and under Title VII.  <u>Dominguez v. Hotel, Motel,</u>

<u>Restaurant & Misc. Bartenders</u>, 674 F.2d 732, 733 (8th Cir. 1982).  <u>See</u> <u>also</u> <u>Korlin</u>

<u>v. Chartwell Health Care, Inc.</u>, 128 F. Supp. 2d 609 (E.D. Mo. 2001) (ADEA claim);

<u>EEOC v. Am. Cyanamid Co.</u>, No. 2:01CV110MLM, 2002 WL 31505551 (E.D. Mo.

Oct. 8, 2002) (ADA claim).  This Court further notes that no court of appeals has

yet to reject the <u>Einhorn</u> or <u>Artistic Furniture</u> line of cases.

This Court finds the <u>Einhorn</u> and <u>Artistic Furniture</u> decisions, applying an

expanded successor liability test to determine whether a successor corporation is

liable for delinquent employee benefit contributions, to be persuasive.

Accordingly, to determine whether Lindstrom is liable for any delinquent

employee benefit contributions, the Funds must show that Lindstrom had

knowledge of EnviroTech's contractual obligations to contribute to the Funds,

and that EnviroTech was liable for delinquent contributions, and that there exists

sufficient evidence of continuity of operations between the buyer and the seller.

### 1.    Substantial Continuity of Business

A corporate successor is one where there is a "substantial continuity of

identity in the business enterprise."  <u>Howard Johnson Co. v. Hotel & Restaurant</u>

<u>Employees, Detroit Local Joint Exec. Bd.</u>, 417 U.S. 249, 263 (1974).  To determine

whether there is a continuity of business identity, the Court must find the

following: 1) whether there has been a substantial continuity of the same business

operation; 2) the new employer uses the same plant; 3) a majority of the new

workforce is made up of the predecessor's employees; 4) the same jobs exist

under the same working conditions; 5) the same supervisors are employed; 6) the

same machinery, equipment and methods of production are used; and 7) the

product is manufactured or the same services are offered.  <u>3750 Orange Place Ltd.</u>

<u>P'ship v. Nat'l Labor Relations Bd.</u>, 333 F.3d 646, 655 (6th Cir. 2003) (citing <u>Fall</u>

<u>River Dyeing & Finishing Corp. v. N.L.R.B.</u>, 482 U.S. 27, 43 (1987)).  The Court

must consider the above under the totality of the circumstances, no one factor is

determinative.  <u>Id.</u>

On the record currently before the Court, there appears to be fact questions

as to whether Lindstrom is continuing the same business enterprise as

EnviroTech.  Many of EnviroTech's employees obtained employment with

Lindstrom Environmental, including the President of EnviroTech, Sobaski, and much of the office staff.  Further, there is evidence to suggest the Lindstrom completed projects started by EnviroTech.  It thus appears that Lindstrom Environmental provides the same services as EnviroTech, and there is some evidence that corporate resources were co-mingled through at least February 2010.

There is also a fact question as to whether Lindstrom Environmental purchased EnviroTech's assets after an arms length negotiation.  EnviroTech argues that the Dore proposal valued the equipment at $250,000.  (4th Sobaski Aff., Ex. G.)  The cost of the equipment at issue was $688,554.92.  (Nissen Aff., Ex. R.)  It is EnviroTech's position that the final purchase price of $175,000 was not negotiated - Sobaski asked for that amount and Lindstrom agreed, without having the equipment evaluated.  (Id., Ex. Q (Lindstrom Dep. at 24).)

### 2.    Notice of the Delinquency

The notice prong is satisfied by either actual or constructive knowledge, and it is satisfied where an employee of the predecessor company who had knowledge of the pension contribution liability begins employment with the successor company. See Golden State, 414 U.S. at 173.  In this case, Sobaski

admitted that he attempted to resolve EnviroTech's liability prior to the asset

purchase sale on August 25, 2009.  (4th Sobaski Aff. ¶ 35.)  Sobaski thereafter

became an employee of Lindstrom, in charge of Lindstrom Environmental.

It is unclear, however, what information was actually or constructively passed on

to the decision makers at Lindstrom prior to its purchase of EnviroTech's assets.

Summary judgment as to successor liability is not warranted on this

record.

**IT IS HEREBY ORDERED** the Defendant Lindstrom Cleaning &

Construction Inc. d/b/a Lindstrom Restoration and Lindstrom Environmental,

Inc.'s Motion for Summary Judgment [Doc. No. 122] is DENIED.

Date:   July 1, 2011


s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court